Below is an opinion of the court.

_David W. Hercher_
DAVID W. HERCHER
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | |
| **Springer Construction LLC**, | Case No. 22-31974-dwh7 |
| Debtor. | **MEMORANDUM DECISION ON MATTSONS' MOTION TO DETERMINE AND DIRECT PAYMENT OF SECURED CLAIM**[1] |

## I.     Introduction

Jeff and Terra Mattson have moved to determine the amount of their secured claim and direct that it be paid from property-sale proceeds the chapter 7 trustee holds.[2] Because the Mattsons share a last name, I will refer to Jeff Mattson as Jeff.

---

[1] This disposition is specific to this action. It may be cited for whatever persuasive value it may have.
[2] ECF No. 28.

Page 1 – MEMORANDUM DECISION ON MATTSONS' MOTION TO etc.

For the reasons below, I will grant the motion except with respect to prepetition interest.

## II. Background

On January 31, 2021, the chapter 7 debtor, Springer Construction LLC, agreed to build and sell the Mattsons a house on land on Allison Road in Sherwood, Oregon. They negotiated and signed an earnest-money agreement (EMA).[3]

The EMA set the purchase price at $1,590,949 "plus or minus changes in the construction of the House as agreed upon by the parties."[4] The EMA describes its Exhibit 1 as "the budget for construction of the House" and states that "the amount"—referring to the budget—"may be added upon or deleted as agreed by the parties" and "[i]f there will be a change in the purchase price, the parties agree to make their changes in writing by using a change order signed by both Contractor and Buyer."[5]

The EMA set July 14, 2021, as the deadline for Springer to complete construction of the house, obtain a certificate of occupancy, close the sale,[6] and give the Mattsons possession.[7]

---

[3] ECF No. 69-1 Ex. 1.
[4] ECF No. 69-1 Ex. 1 at 1.
[5] ECF No. 69-1 Ex. 1 at 2 ¶ 3.
[6] ECF No. 69-1, Ex. 1 at 1 ¶ 2.
[7] ECF No. 69-1, Ex. 1 at 2.

On March 16, 2022, Steve Shaw, on behalf of Springer, emailed the Mattsons' agent[8] with a spreadsheet.[9] Shaw described the spreadsheet as "paperwork for the SW Allison Extras you requested." The spreadsheet's penultimate line says that the "Estimated New Sales Price as of 2/28/2022" was $2,225,426.64. The spreadsheet includes eight pages of narrative statements of Springer's position on changes the Mattsons had requested, but without any associated price or cost figures.[10] Shaw said in the email that amounts in the spreadsheet are "within a reasonable amount for the time that I have had to commit to this." He concluded by asking whether the Mattsons "can afford the home at the current price (which continues to increase daily) or not" and saying that he needed the answer "no later than tomorrow, March 17th by 9PM." If by then the Mattsons "are not able to commit to purchasing the house and provide proof that they can," Springer would immediately market the property "for the market price."

Two days later, the Mattsons sued Springer in state court for specific performance of the EMA and, alternatively, damages.[11] They alleged that the price was limited to the original purchase price[12] plus an increase of $13,784 for upgrades to which they had agreed and for which they had paid

---

[8] ECF No. 65-22 Ex. V.
[9] ECF No. 65-25 Ex. Y.
[10] ECF No. 65-25 Ex. Y at 8–15.
[11] ECF No. 69-9 Ex. 10.
[12] ECF No. 69-9 Ex. 10 at 6 ¶ 19.

Springer.[13] Three days later, Springer recorded a notice of pendency of action with respect to the lawsuit.[14]

In Springer's answer to the complaint, it included a counterclaim for breach of contract alleging that "[p]ursuant to the agreement of the parties, the price substantially increased."[15]

On May 11, 2022, Springer agreed to sell the property to Michael and Brooke Matsuda for $2,775,000.[16]

On November 25, Springer filed its chapter 7 petition without having or resolved the Mattsons' lawsuit or sold the property.

## III.    Procedural status

On January 18, the chapter 7 trustee moved for authority to sell the property to the Matsudas for $2,484,252, free and clear of liens and claims, including that of the Mattsons.[17] The next day, the trustee sought and obtained an order authorizing his rejection of the EMA.[18] On February 7, Springer responded to the trustee's sale motion and objected only to disbursements on account of certain secured claims, including the Mattsons', because Springer expected to object to the Mattsons' secured claim.[19]

---

[13] ECF No. 69-9 Ex. 10 at 5 ¶ 12.
[14] ECF No. 69-4 Ex. 4.
[15] ECF No. 69-10 Ex. 11 at 4 ¶ 11.
[16] ECF No. 69-6 Ex. 7 at 5:38.
[17] ECF No. 19.
[18] ECF No. 21.
[19] ECF No. 25.

On February 21, the Mattsons moved to determine the amount of their secured claim and to direct that it be paid from sale proceeds when the sale closed.[20] That's the motion I decide here. The Mattsons assert a secured claim for $380,465.47, the sum of the initial deposit of $325,000, a second deposit of $13,784, and prepetition interest of $41,681.47 from July 14, 2021, at 9 percent per year. Springer objected to the motion.[21]

On March 8, I granted the trustee's motion to sell and required that he retain and not disburse proceeds payable to certain secured creditors, including the Mattsons.[22]

On April 21, the trustee closed the sale to the Matsudas.[23]

## IV.    Bankruptcy court authority

Because the motion seeks allowance of a claim against the estate and determination of the validity of liens, it is a core proceeding under 28 U.S.C. § 157(b)(2)(B) and (K). I thus may hear and determine the motion and enter an appropriate order.[24]

## V.    Mattsons' secured claim

The Mattsons filed an amended secured proof of claim on March 29.[25] Besides claiming the amounts in the motion and asserting that the claim is oversecured, they assert entitlement to postpetition interest at 9 percent per

---

[20] ECF No. 28.
[21] ECF No. 33.
[22] ECF No. 36.
[23] ECF No. 61; ECF No. 69-19 Ex. 20.
[24] 28 U.S.C. § 157(b)(1).
[25] Claim 5-2.

year. Springer does not challenge the first two amounts.[26] It challenges the claimed security and the interest components, and it raises defenses, including setoff.

### A. Liens

The Mattsons allege that their claim is secured by both an Oregon common-law equitable lien and one under 11 U.S.C. § 365(j).

The property is in Oregon, and the parties have proceeded as though Oregon law applies to the claim. In Oregon, a buyer under an executory contract to buy land acquires "an estate in the land . . . in proportion as he pays the purchase price." If the seller repudiates or fails to perform the contract, the buyer has the right to foreclose the "equitable lien upon the premises."[27] Under 365(j), a buyer under a rejected executory contract to buy land who is not in possession has a lien on the land for the amount paid.

Springer's only argument against the two asserted liens is that they don't arise "under the terms of the contract."[28] But neither theory requires that the lien arise under any contract.

I agree with the Mattsons that they have both types of lien. The claim is secured.

---

[26] ECF No. 74 at 2:6 ¶ 4.
[27] Stewart v. Mann, 165 P. 590, 592 (Or. 1917). *See also* Howard v. Linnhaven Orchard Co., 228 F. 523, 526 (D. Or. 1913).
[28] ECF No. 33 at 1:24–26.

### B. *Interest*

#### 1. Legal authority for interest

The Mattsons claim entitlement to 9 percent interest, before and after the petition date, under Oregon Revised Statutes § 82.010(1)(a).[29] Under 82.010(1)(a), for "transactions," 9 percent interest accrues on "all moneys after they become due."

In Springer's response, it addresses 82.010 as though it applies only to judgments.[30]

Section 82.010(1)(a) applies to any "transaction" where "the parties have not otherwise agreed to a rate of interest" and after "moneys . . . become due"—with no requirement of a judgment. Interest on judgments is addressed separately in 82.010(2). The juxtaposition of those two subsections indicates that subsection (1) applies to transactions, which are distinct from judgments.

The Mattsons also argue that they are entitled to interest under 11 U.S.C. § 726(a)(5). But, as Springer argues, 726 applies only to the amount payable on account of an unsecured claim and thus does not apply to a secured claim.

#### 2. Prepetition interest

Because the source of the Mattsons' right to interest is 82.010(1)(a), I must determine when the refund became due from Springer to the Mattsons. The Mattsons argue that Springer owed the refund on July 14, 2021, when

---

[29] ECF No. 28 at 7:22–24.
[30] ECF No. 33 at 4:1–11.

the EMA required that the sale close. And at the latest, they argue, interest began to accrue when they filed their lawsuit on March 18, 2022.[31] Springer disagrees, arguing that the Mattsons did not, at least before the petition date, assert that Springer should have returned their payments when the sale didn't close by July 14, 2021, or at any other time, and they acted as though they still desired the sale to close.[32]

Because Springer held the two deposits as partial payments toward the EMA purchase price, the amount of the deposits would be due from Springer as a refund to the Mattsons only if either party were no longer obligated to perform. But I agree with Springer that the Mattsons proceeded, at least through the petition date, as though the sale might still close. Just 14 days before the petition date, they filed in state court a reply in support of their motion for summary judgment on all three of their claims, including for specific performance of the EMA.[33] That the parties had different views on the sales terms doesn't mean that the sale couldn't have closed. They might have agreed on a compromise, or their dispute might have been resolved by the state court.

The EMA makes the refund due, at least after a buyer default, when Springer "sells the real property."[34] When Springer filed its chapter 7

---

[31] ECF No. 67 at 29:15–17.
[32] ECF No. 33 at 4:19–25.
[33] ECF No. 69-16 Ex. 17.
[34] ECF No. 69-1 Ex. 1 at 2 ¶ 6.

petition, it became impossible for it to sell the property to anyone—at least without the property's abandonment by the trustee, which Springer never sought.

Under the EMA, the refund became due on the petition date, so under 82.010(1)(a), no interest accrued before the petition date.

### 3. Postpetition interest

The Mattsons' secured proof of claim asserts entitlement to postpetition interest at 9 percent per year. In their pretrial brief, they argue that, because their claim is oversecured, 11 U.S.C. § 506(b) entitles them to postpetition interest.[35] They cite the Supreme Court's 1989 decision in *U.S. v. Ron Pair Enterprises, Inc.*,[36] for the proposition that no contractual right to interest is required "where interest is provided for by statute."[37] They also refer again to 82.010(1)(a).[38]

In Springer's pretrial brief, it argues that the Mattsons cannot recover interest under 506(b) "absent a contractual provision providing for interest."[39]

Section 506(b) requires that there be allowed to the holder of an oversecured claim "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose." The *Ron Pair* Court held that a claim is secured under 506(b)

---

[35] ECF No. 67 at 28:8–9.
[36] 489 U.S. 235, 247–48 (1989).
[37] ECF No. 67 at 29:21–23.
[38] ECF No. 67 at 28:8–9.
[39] ECF No. 64 at 16:8–12.

Page 9 – MEMORANDUM DECISION ON MATTSONS' MOTION TO etc.

whether the security is a consensual security interest or a nonconsensual lien[40] and that the qualifying phrase "provided for under the agreement under which such claim arose" modifies only "any reasonable fees, costs, or charges" and not "interest."[41] (The phrase "or State statute" was added after *Ron Pair*.) Thus, interest must be allowed even if not provided for under the agreement or state statute under which the claim arose. Springer does not otherwise dispute the Mattsons' claim for postpetition interest, and in particular it doesn't question that the rate is governed by 82.010.

The Mattsons are entitled to allowance of postpetition interest at 9 percent per year.

## VI.    Springer's defenses

### A.    *Deduction for construction interest*

Springer argues that the refund the estate owes the Mattsons should be reduced by interest that Springer on a loan it took to finance the construction. In EMA paragraph 6, the Mattsons agreed that the deposit refund would be reduced by the interest on Springer's loan to finance construction of the house after July 14, 2021—"if Buyer fails to Close" by then.[42]

The Mattsons can't be said to have failed to close unless they had an opportunity and obligation to do so on the EMA terms. They had no

---

[40] *Ron Pair Enters.*, 489 U.S. at 240.
[41] *Ron Pair Enters.*, 489 U.S. at 241.
[42] ECF No. 69-1 Ex. 1 at 2 ¶ 6; ECF No. 64 at 2:20 – 3:2.

opportunity or obligation to close unless Springer had satisfied all its preclosing obligations, including completion of construction and obtaining a certificate of occupancy. That didn't happen by July 14, 2021. And there's no evidence that the parties agreed, expressly or by implication, to amend paragraph 6 to replace July 14, 2021, with a later date. Even if that had happened, it wouldn't matter, because Springer didn't complete construction and obtain a certificate of occupancy until after the petition date in connection with the trustee's sale of the property to the Matsudas.

Springer says that its obligation to enable closing by July 14, 2021, was discharged because performance became impossible.[43] But even if Springer did not have to close by that date, it would still be the case that the Mattsons didn't fail to close by then.

Springer describes paragraph 6 as permitting the construction-interest deduction "if the Mattsons were at fault if failing to close."[44] Springer also argues that they breached the EMA by seeking specific performance on their theory of the appropriate price[45] and that the breach permits the estate to deduct the interest.[46]

But, again, Springer relies on language that's not in paragraph 6. Springer's (and now the estate's) right to deduct construction interest from

---

[43] ECF No. 64 at 14:2–4.
[44] ECF No. 64 at 15:11–15. *See also* ECF No. 64 at 15:22 – 16:2.
[45] ECF No. 64 at 13:4–20.
[46] ECF No. 64 at 15:22 – 16:2, 18:2–4.

the refund turns not on the Mattsons' breach of the EMA, but on whether they failed to close by July 14, 2021. Only that failure, and not any other EMA breach by them, could result in reduction of the refund by the amount of construction interest.

Springer concedes that, had it breached the EMA, the Mattsons would have been entitled to the full refund without deduction for the construction interest (subject to Springer's offset defenses).[47] Even if Springer did not breach before the petition date, the trustee rejected the EMA after the petition date. Under 365(g)(1), rejection constituted breach right before the petition date. The breach from rejection gave the Mattsons the same damages claim they would have had had Springer breached before the petition date.

The Mattsons' claim is determined without deduction for the construction interest.

### B.   Setoffs

Springer argues that the estate may offset against the Mattsons' refund claim amounts due from them to the estate on claims the estate holds against them.[48] The offsetting claims include those that it asserted as counterclaims in state court.[49] Although Springer refers to the estate claims as counterclaims,[50] it acknowledges that it can raise estate claims to support a

---

[47] ECF No. 64 at 18:9–11.
[48] ECF No. 33 at 7–8.
[49] ECF No. 33 at 6:15–20.
[50] ECF No. 33 at 6:15–16.

Page 12 – MEMORANDUM DECISION ON MATTSONS' MOTION TO etc.

claim objection only "to the extent of providing a basis for a defensive offset."[51] At a preliminary hearing, I overruled the Mattsons' objection to Springer's standing to assert the counterclaims defensively.[52]

### 1. Breach of contract

#### (a) *The Mattsons' filing of their state-court complaint*

In Springer's response to the Mattsons' motion, it argues that the Mattsons breached the EMA by filing their state-court complaint. In one section of Springer's pretrial brief, it refers to "substantial damage [the Mattsons] caused by their baseless suit."[53] And in another section, it alleges that they breached by denying in their complaint that the EMA was a "cost plus contract" and by seeking specific performance.[54]

Springer's rationale seems to be that the Mattsons, by filing the state-court complaint, denied that the contract was (as Springer says it was) a cost-plus contract. Springer does not elaborate, but I'm aware of no legal theory that a contract party breaches just by taking an incorrect litigation position. At best, the Mattsons' litigation position, if it was incorrect, constituted repudiation of the EMA, entitling Springer to recover damages for total breach. But for the reasons set forth in part VI.B.1(c) below, Springer can't recover even if the Mattsons breached by repudiation.

---

[51] ECF No. 33 at 6:7–10, *quoting In re* Hickman, 384 B.R. 832, 838 (9th Cir. B.A.P. 2008).
[52] ECF No. 54.
[53] ECF No. 64 at 3:18.
[54] ECF No. 64 at 13:15–20.

The Mattsons did not breach by filing their state-court complaint.

**(b)** ***The Mattsons' failure to pay for changes***

In Springer's response to the motion, it refers to its state-court counterclaim for breach of contract.[55] That counterclaim alleges that the Mattsons breached because they "continued to make changes to the construction of the house and have failed to pay for the changes made."[56]

If the EMA purchase price included the cost of changes Springer made at the Mattsons' request, no provision of the EMA requires the Mattsons to pay before the closing. Instead, "changes in the construction of the House as agreed by the parties" were to be reflected in "the remaining purchase price" to be paid "[u]pon completion of the construction of the House and the certificate of occupancy."[57]

No closing of a sale to the Mattsons ever occurred, so they did not breach by failing to pay Springer for changes.

**(c)** ***The Mattsons' failure to provide adequate assurance of due performance***

In a section of Springer's pretrial brief, it refers to Shaw's March 16, 2022, email as a demand, arguing that Springer "had the right to demand from the Mattsons assurances that they could comply with the contract." Springer invokes the right of a contract party to "demand assurance of due performance when it has reasonable grounds to believe that the obligator

---

[55] ECF No. 33 at 5:7–9, Ex. 6 at 2.
[56] ECF No. 33 at 5:9, Ex. 6 at 2:7–9 ¶ 13.
[57] ECF No. 69-1 Ex. 1 at 1 ¶ 2.

Page 14 – MEMORANDUM DECISION ON MATTSONS' MOTION TO etc.

cannot or will not perform when performance is due" and, if the requested assurances are not provided within a reasonable time, to consider the contract repudiated.[58] Springer also invokes the right of an injured party, upon repudiation, to elect to terminate the contract and sue for damages for total breach.

Because the sale to the Mattsons never closed, it hasn't yet been necessary to resolve the parties' two primary disputes about the purchase price: (1) whether Springer could include in the price the cost or reasonable value of additions or upgrades to the 43 components listed in Exhibit 1 to the EMA, even if the parties didn't both sign change orders stating the nature and amount of each addition or upgrade, and (2) whether Springer could treat the price as an estimate and charge the actual, market-based cost.

Here, because the EMA was rejected, the only consequence of the Mattsons' repudiation, if it occurred, is that it would give the estate an offsetting claim against them for the amount of damages from repudiation. But without proof of damages, repudiation would have no relevance to establishing the amount of their secured claim.

Springer's discussion of repudiation in its pretrial brief does not explain what damages would have resulted from repudiation. In a separate section, it argues that its damages from the Mattsons' wrongful filing of the complaint

---

[58] ECF No. 64 at 12:10–22.

include amounts Springer incurred to finance the construction.[59] But as I discussed in part VI.A above, the parties agreed in the EMA that construction interest wouldn't be recoverable from the Mattsons unless they failed to close by July 14, 2021—which they didn't.

In another separate section of its response, Springer refers to the Mattsons' notice of pendency as having "eliminated Debtor's means of mitigation."[60] But as discussed in part VI.B.2 below, the recording of the notice of pendency itself was permitted by statute and thus was not actionable. Springer did not demonstrate that it could have sold the property to the Matsudas before the petition date; Shaw testified that no certificate of occupancy was obtained until just before the trustee's postpetition sale to the Matsudas. Shaw also said that he could have, but didn't, finish the house and get the certificate in two to three weeks in the spring of 2022, after agreeing to sell to the Matsudas, but he didn't explain why he didn't do so.

In any case, the price for which the trustee did sell the property to the Matsudas, $2,484,252, exceeded the $2,225,426.64 price that Shaw said on March 16 the Mattsons would have to pay. In other words, if the Mattsons repudiated, the estate—the real party in interest—more than mitigated any damages from any prepetition breach by the Mattsons.

---

[59] ECF No. 33 at 5:9–26 – 10:1–5.
[60] ECF No. 64 at 17:5–7.

Because Springer has not demonstrated that any repudiation by the Mattsons damaged Springer, any repudiation would not reduce the amount of the Mattsons' secured claim.

## 2. Slander of title by filing lis pendens

In Springer's response under the heading "slander of title," it alleges that the Mattsons' recording of the notice of pendency of action was wrongful because the EMA limited the remedies for Springer's default to refund of amounts the Mattsons had paid Springer.[61]

Oregon Revised Statutes § 93.740(1) authorizes the recording of a notice of pendency of action "[i]n all suits in which the title to or any interest in or lien upon real property is involved, affected or brought in question." The recording does not affect the rights or defenses of the defendant. Instead, it puts purchasers on notice "of the rights and equities in the premises of the party filing the notice."[62] Thus, as between the litigation parties, the recording affects only the rights of the plaintiff by preventing any purchaser from obtaining an interest in the property without record notice of the interest of the plaintiff.

---

[61] ECF No. 33 at 6:23–26, 7:1–6.
[62] Or. Rev. Stat. § 93.740(2).

By seeking specific performance of a contract to buy the property, the Mattsons' complaint "involved, affected or brought in question" title to the property[63] and thus was a proper subject of a notice of pendency.

Springer points to no provision of the EMA limiting the Mattsons' remedies on Springer's breach to a refund of amounts the Mattsons had paid Springer. A contract for sale of land is specifically enforceable if it is definite in all material respects, with nothing left for future negotiation.[64] Here, although the parties disagree on how the language of the EMA sets the price, nothing in the EMA requires any new negotiation of the price or any other material term, including the closing conditions and deadline. Springer does not point to any indefiniteness in the EMA that would prevent specific enforcement. The EMA was thus specifically enforceable by the Mattsons.

Springer's assertion that specific performance is unavailable under the EMA is also the basis of its argument that the Mattsons' assertion of that right was a false or fraudulent statement made with malice, rendering the complaint a slander on Springer's title to the property. But because specific performance was available to the Mattsons, the complaint was not a slander on title.

---

[63] *See* Soliz v. Jimenez, 193 P.3d 34, 40–41 (Or. App. 2008) (notice of pendency of action for specific performance of land sale contract rendered later-recorded conveyance void).
[64] Ochs v. Albin, 903 P.2d 906, 909 (Or. App. 1995).

### 3.      Intentional interference with contract

In Springer's response under the heading "intentional interference with a contract," it alleges that the Mattsons or their agent told Springer's a representative of Kelly Group, the real-estate brokerage firm engaged to sell the property, that Kelly was wasting its time because Springer could not sell the property.[65]

To prove a claim for interference with economic relations under Oregon law, the plaintiff must establish elements including "a causal effect between the interference and the harm to the economic relationship" and damages.[66]

In an April 12, 2022, email, Jeff asked Kelly if it was aware of two lawsuits against Springer affecting the property, the first by a framing subcontractor and the second by the Mattsons.[67] In an April 29, 2022, letter by a lawyer for the Mattsons, copied to Kelly, the lawyer demanded that Springer cease efforts to sell the property to anyone other than the Mattsons.[68]

Springer offered no evidence that those communications affected its relationship with Kelly. The several documents constituting Springer's agreement to sell the property to the Matsudas reflect Kelly's representation

---

[65] ECF No. 33 at 7:6–14.
[66] McGanty v. Staudenraus, 901 P.2d 841, 844 (Or. 1995).
[67] ECF No. 69-7 Ex. 8 at 2.
[68] ECF No. 69-5 Ex. 6.

Page 19 – MEMORANDUM DECISION ON MATTSONS' MOTION TO etc.

of Springer from April 25 through May 11, 2022—after the communications by and on behalf of Jeff.[69]

The Mattsons are not liable for interference with Springer's relationship with Kelly.

### 4.    Defamation

In Springer's response under the heading "defamation," it alleges that the Mattsons contacted a person from whom Springer had contracted to buy other property, and they did so "with the intent of scuttling that deal," after which the seller terminated the contract.[70]

To establish a claim for defamation under Oregon law, a plaintiff must demonstrate that the defendant made and published to a third party a defamatory statement about the plaintiff. A statement is defamatory if it would subject the plaintiff "to hatred, contempt or ridicule [or] tend to diminish the esteem, respect, goodwill or confidence in which [the plaintiff] is held or to excite adverse, derogatory or unpleasant feelings or opinions against [the plaintiff]."[71]

Springer's defamation claim in its response does not allege that the Mattsons made a statement to the seller, nor does it allege facts indicating

---

[69] ECF No. 69-6 Ex. 7.
[70] ECF No. 33 at 7:15–21.
[71] Neumann v. Liles, 369 P.3d 1117, 1121 (Or. 2016); Andreason v. Guard. Pub. Co., 489 P.2d 944, 945 (Or. 1971).

Page 20 – MEMORANDUM DECISION ON MATTSONS' MOTION TO etc.

that any statement was defamatory. In any case, Springer did not address its defamation claim in its pretrial brief or present supporting evidence at trial.

The Mattsons are not liable for defamation.

## 5. Trespass

In Springer's response under the heading "trespass and conversion," it alleged that the Mattsons entered onto the property and removed items of personal property, or chattels.[72]

Under Oregon law, a trespass occurs when one "enters or remains on premises in the possession of another without privilege to do so."[73]

Jeff testified that Shaw allowed Jeff to be on the property and enter the house by giving Jeff the door code in a text message. Jeff retrieved items that he owned and had brought to the house, including mantles and mantle hardware. The next day, Shaw revoked that permission. Shaw denied having given blanket permission for Jeff to enter the house. To the extent their accounts of consent differ, I accept Jeff's and find that he had Springer's consent to enter the property.

The Mattsons are not liable for trespass.

## 6. Conversion

Under Oregon law, conversion "is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another

---

[72] ECF No. 33 at 7:22 – 8:1.
[73] Rich v. Tite-Knot Pine Mill, Inc., 421 P.2d 370, 373 (Or. 1966).

Page 21 – MEMORANDUM DECISION ON MATTSONS' MOTION TO etc.

to control it that the actor may justly be required to pay the other the full value of the chattel."[74]

The factual basis for Springer's conversion claim, as stated in its response to the motion, is indistinct from its trespass claim: the Mattsons entered the property to remove chattels. I accept Jeff's uncontradicted testimony that the removed chattels were owned by the Mattsons and had been brought to the house with the expectation that they would be incorporated into the house by Springer. Springer offered no evidence that the chattels, when removed, had been incorporated into the house or that Springer otherwise had a right, superior to the Mattsons', to control the chattels, requiring that the Mattsons pay Springer for the value of the removed chattels.

In its response, Springer mentioned its counterclaim for conversion, where it stated another fact basis for a conversion claim: the Mattsons "stored personal items on" the property to Springer's "detriment and cost."[75] Because a claim for conversion requires interference with another's right to use a chattel, not real property, Springer can't have a conversion claim for the Mattsons' storage of chattels at the house. Even if Springer had claimed that the storage constituted trespass, Springer would have had to—but did not—prove that the storage occurred without its consent. Because the chattels

---

[74] Becker v. Pacific Forest Industries, Inc., 211 P.3d 284, 287 (Or. App. 2009).
[75] ECF No. 69-10 Ex. 11 at 5 ¶ 26.

Page 22 – MEMORANDUM DECISION ON MATTSONS' MOTION TO etc.

were brought into the house with the expectation of incorporation into the house, I infer that the Mattsons had Springer's consent to do so.

The Mattsons are not liable for conversion.

## 7. Quantum meruit for extra materials and work

In its response under the heading "quantum meruit," Springer claims that it is entitled to recover from the Mattsons "the costs related to extra work requested by [the Mattsons] in the construction of the home." It also claims, apparently in the alternative, that it has "a claim for the time value of the funds expended to cover [the Mattsons'] requested changes."[76]

In the Oregon Supreme Court's 2006 decision in *Ken Hood Construction Co. v. Pacific Coast Construction, Inc.*, the court held that, if parties have a valid contract, any breach remedies flow from the contract, and a party "cannot recover in *quantum meruit* for matters covered by the contract."[77] Where a recovery in quantum meruit is available, the elements that must be proved include a benefit conferred, awareness by the recipient that a benefit has been received, and judicial recognition that, under the circumstances, it would be unjust to allow retention of the benefit without requiring the recipient to pay for it.[78]

---

[76] ECF No. 33 at 8:1–7.
[77] 126 P.3d 1254, 1256 (Or. App. 2006) (italics in original).
[78] Safeport, Inc. v. Equip. Roundup & Mfg., Inc., 60 P.3d 1076, (Or. App. 2002).

Page 23 – MEMORANDUM DECISION ON MATTSONS' MOTION TO etc.

Here, the EMA is a valid contract that defines if, when, and how much the Mattsons owe payment to Springer. That the parties disagree on the contract terms, or that the terms might have been changed by subsequent agreement or conduct, doesn't change the fact that a valid contract defines Springer's right to payment. For that reason, quantum meruit is unavailable to Springer.

Even if no valid contract defined Springer's right to payment, quantum meruit still would be unavailable. All materials Springer bought became its property, and all work it did on the property increased the property's value. The estate liquidated that benefit when it sold the property. Because the property wasn't sold to the Mattsons, they saw none of that benefit.

The Mattsons are not liable in quantum meruit.

### C. Unclean hands

Springer argues in its pretrial brief that "[t]o receive equity, one must have clean hands,"[79] and, for several reasons, approving any payment to the Mattsons "would not be equitable."[80]

In the case Springer cites for that proposition, *Gratreak v. North Pacific Lumber Co.*, the Oregon Supreme Court denied application of the clean-hands maxim of equity where the underlying action was one at law because the plaintiff sought damages for breach of a contract. The court distinguished

---

[79] ECF No. 64 at 3:2.
[80] ECF No. 64 at 3:16–19.

Page 24 – MEMORANDUM DECISION ON MATTSONS' MOTION TO etc.

another case in which the plaintiff had sought to enjoin violation of a contract, making the action one in equity where the clean-hands doctrine did apply.[81]

Here, the motion asks to fix the amount of the Mattsons' secured claim so that it can be paid. That relief is analogous to an action at law for damages. So the motion is not one in which equitable relief, including application of the unclean-hands doctrine, is available.

### D. Mitigation of damages

Springer argues in its pretrial brief that, because the Mattsons declined to accept a refund of the amount they paid so Springer could sell to the Matsudas, the Mattsons "are responsible for all of the additional costs incurred by Debtor as a result of their baseless claim for specific performance."[82] For that proposition, Springer cites an Oregon Supreme Court holding that "[a] party injured by a breach of contract is required to do what reasonable care and business prudence would dictate in order to minimize his loss."[83]

The avoidable-loss doctrine seeks to reduce the loss of the injured party, not the injuring party, and it requires only that the injured party take reasonable loss-avoidance steps. Here, Springer argues that the Mattsons should have forgone their right to buy under the EMA. But doing so would

---

[81] 609 P.2d 375, 378 (Or. App. 1980).
[82] ECF No. 64 at 17:14–17.
[83] Schafer v. Sunset Packing Co., 474 P.2d 529, 543 (Or. 1970).

not have been a reasonable loss-avoidance step, and it wouldn't have reduced the Mattsons' entitlement to receive a refund of the amounts paid.

No portion of the Mattsons' refund claim is an avoidable loss.

## VII.   Conclusion

The Mattsons have a secured claim against the proceeds of the property for $338,784 plus postpetition interest at 9 percent per year. The claim does not include the additional $41,681.47 amount of claimed prepetition interest. The claim is not subject to any setoff. The trustee may and must pay the secured claim.

I will enter a separate order.

###